**Edgar JAMES, Plaintiff,**

v.

**WEST VIRGINIA BOARD OF REGENTS, a Statutory Corporation, Successor to the West Virginia Board of Education; Wendell G. Hardway, President of Bluefield State College, a State Supported Institution of Higher Learning; Dr. Gordon Short, Director of Placement of Student Teachers at Bluefield State College; and the Board of Education of Mercer County, a Statutory Corporation, Defendants.**

**Civ. A. No. 1159.**

United States District Court,
S. D. West Virginia,
Bluefield Division.

Jan. 13, 1971.

Brown H. Payne, Beckley, W. Va., Jack Greenberg, James M. Nabrit, III, Conrad K. Harper, New York City, Clarence C. Malone, Jr., Durham, N. C., for plaintiff.

Chauncey H. Browning, Jr., Atty. Gen. of West Virginia, Cletus B. Hanley, Deputy Atty. Gen. of West Virginia, Joseph G. Hodgson, Asst. Atty. Gen., State of West Virginia, Charleston, W. Va., for defendants West Virginia Board of Regents, Wendell G. Hardway and Dr. Gordon Short.

Joseph M. Sanders, Sanders & Blue, Bluefield, W. Va., for defendant Board of Education of Mercer County.

CHRISTIE, District Judge:

This case involves an action brought pursuant to the provisions of 42 U.S. C.A. §§ 1983 and 1985, 28 U.S.C.A. § 1343, and the First and Fourteenth Amendments to the Constitution of the United States, wherein the plaintiff seeks to vindicate his right to do student practice teaching in the public schools of Mercer County, West Virginia, and to recover compensatory and punitive damages from the defendants for depriving him of that right. Named as defendants are The West Virginia Board of Regents;[1] Dr. Wendell G. Hardway, President of Bluefield State College; Dr. Gordon Short, Director of Placement of Student Teachers at Bluefield State College; and the Board of Education of Mercer County.

By stipulation and order, entered February 5, 1970, the following issues were raised:

I. Whether the plaintiff has a right, through either the Federal or State Constitution, or by federal or state law, to be assigned to a school in the public school system of Mercer County, West Virginia, to do student practice teaching, and if so, nas he been unlawfully deprived of such right and by whom?

II. If it is found the plaintiff has no such right but does have a discretionary privilege, under federal or state law, to be assigned to do student practice teaching in the public school system of Mercer County, in what public official or public body does such discretionary power lie; what guidelines, if any, are laid down for its application and what criteria and procedures are usually and customarily followed in reaching a decision?

III. Whether, in the application of such discretionary power, in plaintiff's case, such guidelines, criteria and procedures were followed in the usual and customary manner, and if not, why and in what manner the plaintiff was discriminated against and for what reason?

IV. Whether, in the application of such discretionary power, the moral character, veracity, conduct and reputation of the student is a proper subject of inquiry and consideration, and if so, was such inquiry and consideration discriminatorily applied in plaintiff's case, if so, how and for what reason?

V. Whether the "State defendants" (West Virginia Board of Regents, Wendell G. Hardway or Dr. Gordon Short) conspired with each other or with other persons to prevent the plaintiff from re-

1. The West Virginia Board of Regents was dismissed at the close of plaintiff's evidence.

ceiving his practice teaching; if so, was the conspiracy or acts performed in deprivation of plaintiff's civil rights and for what reason?

VI. Whether the "County defendant" (Board of Education of Mercer County) conspired with any other person or persons to prevent plaintiff from receiving his practice teaching; if so, was the conspiracy or acts performed in deprivation of plaintiff's civil rights and for what reason?

VII. The relief, if any, to which the plaintiff is entitled and the nature and extent thereof.

An evidentiary hearing on these issues was commenced on the 5th day of February, 1970, and was concluded on the 9th day of February, 1970. Decision was deferred pending preparation of a transcript of the evidence and the submission of briefs. The Court now makes its findings and conclusions.

## FINDINGS OF FACT

1. Plaintiff, Edgar James, is an American Negro reared in Logan County, West Virginia, and educated in the public schools of Logan County, West Virginia. He served in the United States Army and received an honorable discharge, after which he enrolled as a student at Tuskegee Institute in Alabama, remaining for a period of two months. He then moved to Bluefield, West Virginia, and entered Bluefield State College, a tax-supported institution of higher learning, where he majored in social studies and physical education.

In November of 1968, plaintiff, in his last semester at Bluefield State College, was engaged in his student practice teaching assignment at Richlands High School, in Tazewell County, Virginia. On November 21, 1968, the physical education building of Bluefield State College was bombed and damaged to the extent of $82,000. School was suspended and the dormitories were closed. The college reopened for classes on December 2, 1968, but the dormitories remain closed. On November 24, 1968, plain-

tiff was arrested, along with several other students, and charged with felonious conspiracy to bomb said building. As a result of the charge, plaintiff was suspended pursuant to the rules and regulations of the college. He was never brought to trial and the indictment against him was subsequently dismissed in August 1969. He did not thereafter request that the suspension be lifted or that he be given a hearing thereon. Plaintiff has completed all academic requirements for graduation from the college with the exception of a 34-day period of practice teaching, at the completion of which he would be entitled to certification to teach in the public schools of West Virginia.

2. At one time, Bluefield State College was an all black college. Following the desegregation decisions of the Supreme Court of the United States, an increasingly large number of white students have enrolled in the college; the present ratio of students is three whites to one black. Due to an increased demand for black instructors in the national colleges and universities, the college has been forced to hire an increasing number of white instructors. On July 1, 1966, Dr. Wendell G. Hardway became the first white president of the college. Some of the black students became resentful of the new administration and racial tension and difficulty began on the campus shortly thereafter.

3. On October 14, 1967, the first in a series of disrupting events occurred on the campus of Bluefield State College. During half-time ceremonies at the homecoming football game, a demonstration against the alleged discriminatory policies of the administration was staged. While this demonstration started out as peaceful and nondisruptive, before it was over a large number of black students entered the stands and conducted themselves in a disrespectful and threatening manner toward Dr. Hardway and his guests and other members of the college administration to such an extent that the police were summoned to escort Dr. Hardway and his guests to safety. Plain-

tiff was not identified as a participant in this incident, which resulted in several students being suspended from the college. Later these suspended students brought suit in federal court to be reinstated, claiming discrimination in their suspension. The Court held that the college had acted properly in suspending all but one of the students. See Barker v. Hardway, 283 F.Supp. 228 (S.D.W.Va. 1968), aff'd. 399 F.2d 638 (4th Cir. 1968), cert. den. 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1968).

4. On September 16, 1968, a demonstration was staged against the Mercer County Board of Education. The demonstration was in protest to the closing of Stinson Elementary School, in Bluefield, West Virginia, by order of the Mercer County Board of Education,[2] and the transferring of Stinson students to the Park Central High School building, also in Bluefield, for the remainder of the school year. The demonstration was also in protest of the transferring of Park Central High School students to Bluefield High School.

Plaintiff acted as a marshal of the protest march from the city of Bluefield to Princeton, the county seat of Mercer County, where the principal offices of the Mercer County Board of Education are located. He also acted as one of the spokesmen for the protesters. Although the march was peaceful and orderly, the plaintiff in his conference with Clinton D. Lilly, Administrative Assistant to the Superintendent of the Mercer County Board of Education, made threatening remarks to the effect that the decision of the Board would not be obeyed, and further, that unless "conditions worked out for the betterment of students at Park Central and Stinson, then (the) enrollment will be down." Indeed, following the demonstration, there was a marked decrease in attendance at these schools.

5. In 1968 and 1969, Harold Dock was Director of Student Teachers at Bluefield State College. It was his responsibility to place students majoring in education in the various schools for student teaching assignments. In October of 1968, Mr. Dock and Dr. Gordon Short attempted to place plaintiff in Mercer County or Logan County for student practice teaching. Both counties refused to accept him for the stated reason that it would not be in the best interest of their schools or students to do so. Mr. Dock eventually was able to place plaintiff in a Tazewell County school (Richlands High School) approximately 50 miles from Bluefield, in the state of Virginia. Plaintiff, being dissatisfied with the assignment, requested that it be changed. Mr. Dock told him that the assignment could not be changed, but he did not explain why—that Mercer and Logan Counties had rejected him.

On the following day, plaintiff accosted Mr. Dock and told him, "Dock, I am giving you until 9:00 o'clock tomorrow morning to change that assignment or I am going to kill you. I know where you live and I mean what I say." Mr. Dock reported the incident to Dr. Hardway and on the same day a meeting was called in Dr. Hardway's office. Present were Dr. Hardway, Dr. Short, Mr. Dock and plaintiff. It was explained to plaintiff that he was placed in Tazewell County because Mercer and Logan Counties had refused to accept him as a student teacher. At this meeting, plaintiff admitted his threat to Mr. Dock and said that he "meant every word of it."

6. On November 6, 1968, James Green, president of the student council at Bluefield State College, requested that Dr. Hardway attend a meeting of the dormitory council at the student union that night. About 150 students and nonstudents attended the meeting. Plaintiff, who was not a member of the dormitory council or a resident of the dormitory, attempted to hand to Dr. Hardway a list of 35 student demands. Dr. Hardway refused to accept the paper, since plaintiff was not a resident of the dormitory, however, he later accepted the paper

---

2. Closing of the Stinson school was in obedience to a requirement of the state fire marshal.

from James Green who had been handed it by the plaintiff. Plaintiff was the apparent leader of the meeting and requested that Dr. Hardway answer the demands. The discussion of the demands was marked with disrespectful conduct on the part of the students. Following the discussion, Dr. Hardway and the other college officials were requested to, and did, leave the meeting.

7. November 7 and 8, 1968, were marked by incidents of overturning of trays and food in the school cafeteria. Although it was not shown that plaintiff participated in these incidents, it was established that only the night before, plaintiff had stated in a meeting that now was the time for action. As a result of the incident of November 8, 1968, five students were called before the disciplinary committee for action. Pursuant to the regulations of the college, the students were permitted to appear before the committee with a representative. They appeared with the plaintiff as their representative, who placed upon the table a copy of the book "Quotations from Chairman Mao Tse-Tung." On several previous occasions, plaintiff had displayed the book in the presence of other students and once in the presence of Dr. Hardway. He offered no explanation as to why he felt the need to display this book before the disciplinary committee. Plaintiff contended that he read the book purely for educational reasons, but denied knowledge of the fact that Chairman Mao was a communist leader or that he advocated violence. He finally removed the book from the table and placed it in his briefcase. During the few days he was at Richlands High School doing practice teaching, prior to the bombing, he displayed the book "Malcolm X" on top of his desk, but put the regularly used text books in the desk drawer.

8. On November 15, 1968, a meeting was held in the student union building and plaintiff was a speaker at the meeting. Books of matches were distributed to the students in attendance. The next day, many of the black students appeared on the campus with the books of matches pinned or attached to their clothing. Numerous match books had the letters "EOW" printed on them. An inquiry disclosed that "EOW" meant "End of the Week" and "End of the Week" meant that if the students' demands were not met by that time the college would burn. Following this meeting some windows were broken in the student union building.

9. On November 18, 1968, another meeting was held in the student union building with approximately 100 to 150 persons in attendance. Plaintiff participated in this meeting as a speaker. Following the meeting windows were broken and rocks and cans thrown at the campus security officer, Lloyd Davis. Later the same night windows were broken in the swimming pool building. While investigating this incident, Mr. Davis observed plaintiff's car leaving the access road toward the swimming pool area. Plaintiff was stopped and he denied breaking any of the windows. As he drove away, he and his passenger called Mr. Davis and the city policeman who had stopped them "pigs."

10. Prior to the bombing of the physical education building on November 21, 1968, there were numerous other incidents of violence. There had been several thefts of college property from several buildings on the campus. In two instances fires were started on campus. Threatening letters were sent to various administrative officials of the college and threats were made on the lives of Dr. Hardway and Mr. Davis. The letters were signed "Black Power." [3] Dynamite was placed at the home of Mr. Davis and a rock was thrown through the window of Dr. Hardway's residence. An atmosphere of extreme anxiety and

---

3. Robert Clayton Hayes, a black student at the college, later pleaded guilty to a federal indictment charging him with sending a threatening letter through the United States Mails to Dr. Hardway on November 8, 1968.

tension pervaded the entire campus during this period immediately preceding the bombing on November 21, 1968. This tension and fear were present among both black and white students.

11. On November 20, 1968, the evening immediately preceding the bombing at Bluefield State College, a meeting was held at the John Stewart Memorial Church, at which plaintiff was in attendance and was a spokesman. Also present and a spokesman was one William Travis, who later was indicted along with plaintiff and four others in connection with the bombing. Thereafter, Travis was tried and convicted; one was found not guilty; two pleaded guilty; and plaintiff and another were dismissed.[4]

12. Knowledge of the presence of dynamite on campus was brought to the attention of Dr. Hardway on November 21, 1968, 1½ hours prior to the explosion that damaged the physical education building. It appears that many students had prior knowledge of the impending explosion, in particular students of the virtually all black dormitory, although the exact site of the explosion was not commonly known. Following the explosion and during the investigation into the incident, there appears to have been a concerted effort on the part of several blacks, including plaintiff, to persuade those with knowledge of the bombing to refrain from testifying concerning the incident and events surrounding it.

13. In the spring of 1968, plaintiff, on three different occasions, challenged Lloyd Davis, the security officer at the college, to go outside and fight. These challenges resulted from plaintiff's anger over Davis' placing an immobilizer on his car which was parked on the campus in violation of college parking regulations.

14. On November 29, 1968, while in jail charged with the above-mentioned conspiracy, plaintiff wrote a letter addressed to the students of Bluefield State College. The letter urged the black students to "unite and resist those imperialist pigs to the utmost." In conclusion, it urged the plaintiff's "brothers and sisters" to "polish your sword and shield and keep fighting the battle for truth, justice and brotherhood." This letter was posted on the college bulletin board.

15. While plaintiff has repeatedly denied that he was the leader of the black militants on the campus or the leader of any black organization, numerous newspaper articles and other exhibits quoting him and describing his activities and course of conduct strongly indicate that if he was not their leader, he was nonetheless their appointed spokesman.

16. On August 11, 1969, following the dismissal of the indictment against him, plaintiff consulted with Dr. Short concerning readmission to Bluefield State College for the purpose of completing his student teaching requirements and ultimately graduating from the college. He requested that he not be required to go through the normal procedures and that he be allowed to begin his practice teaching immediately instead of waiting for the regularly scheduled period to begin. He also requested that he be given special consideration and be placed in Logan County. All of these requests were granted by the college officials involved and all steps possible were taken to

---

4. David Knight, Prosecuting Attorney for Mercer County, was questioned and answered concerning the dismissal as follows:

"Q. * * * I will ask you why, Mr. Knight, you dismissed this indictment against Edgar James?

"A. Well, there were a number of reasons, Mr. Sanders. First, and one of the most important, was the fact that we had tried the case against Banks, and he had been found not guilty by the jury in a case which we felt was much stronger than the case we had against Edgar James. Secondly, a number of the witnesses that we had in the case were beginning to back up on us. One, in particular, took the Fifth Amendment in the case against Travis. He testified in the Banks case but insisted on a number of occasions that he would not testify against Edgar James."

handle his special circumstances. The college administration conferred with Mercer, Logan and Tazewell Counties, and with Marshall University (which had an agreement with Logan County for student teaching) and West Virginia State College (which had an agreement with the Charleston Job Corps Center for student teachers), concerning the placement of plaintiff as a student teacher. Mercer, Logan and Tazewell Counties declined to accept him. Finally, after much diligent effort, the college was able to persuade the Charleston Job Corps Center, a facility approved by the West Virginia Board of Education for training student teachers, to accept him for practice teaching, but this the plaintiff refused. The Mercer County school board declined to accept plaintiff because they felt, under the circumstances, that it would not be in the best interest of the Mercer County schools for him to do his practice teaching in that county. Clinton D. Lilly, administrative assistant to the superintendent of Mercer County schools, explained that he would not recommend plaintiff for practice teaching in the county because of the adverse publicity he had received in the newspapers and on radio and television. W. R. Cooke, Superintendent of Mercer County Schools, stated that the constant appearance of plaintiff's name in connection with the disruptions at Bluefield State College had given him a bad reputation in Mercer County and that many parents of school children had called the Board of Education and expressed a desire that plaintiff not be allowed to teach in their schools. Cooke stated that plaintiff's attitude and the fact that he was considered to be the leader of the black militants entered into the decision not to accept him.

17. Bluefield State College had a working agreement with Mercer County for the placement of student teachers.[5]

Statutory authority for such agreement appears in Section 6, Article 2, Chapter 18, of the West Virginia Code. This statute vests authority in the West Virginia Board of Education over practice teaching in the public schools of West Virginia.[6] The agreement here in question was signed by Harold Dock, representing Bluefield State College; W. R. Cooke, representing Mercer County Board of Education; and Rex M. Smith, representing the West Virginia Board of Education. The agreement is voluntary in nature and the extent of participation therein is determined by the joint decision of representatives of the college and the superintendent of the county school system with the approval of the principal of the school where the student teacher is to be placed. Neither the statute nor the agreement provides any authority for compelling any county board of education to accept any student, or any particular number of students, for practice teaching, the extent of a board's participation being left entirely to its discretion.

18. There is no evidence whatever to indicate any concerted activity on the part of the officials of Bluefield State College or the officials of the Mercer County Board of Education to deprive plaintiff of the privilege of student teaching in Mercer County or any other county. Quite the contrary is true of the officials of Bluefield State College— they took every step within their power to obtain for plaintiff a position for practice teaching. Indeed, Dr. Hardway, President of the College, who normally had no role in the positioning of student teachers, intervened on behalf of plaintiff to the end that he could be placed as a practice teacher and complete his degree requirements, all in the face of much rudeness and disrespect by the plaintiff toward Dr. Hardway.

5. The college had similar agreements with McDowell County, West Virginia, and Tazewell County, Virginia. However, under its agreement with McDowell County only students who were residents of that county were eligible for assignment there.

6. West Virginia Board of Education is not a party to this action.

19. Mercer County, according to plaintiff, discriminated against him because he was black, but there is no evidence in the record to support this charge. In fact, the evidence is to the contrary. Since 1967, the students accepted for practice teaching in Mercer County have been *predominately* black, which fact is clearly established by evidence of record. Plaintiff was denied the privilege of practice teaching in Mercer County solely on the basis of his reputation.

## DISCUSSION AND CONCLUSIONS OF LAW

The individual defendants in this case being sued as representatives of Bluefield State College, a state institution, are agents of the state, and the corporate defendant Mercer County Board of Education being sued as an arm of the state, for deprivation of constitutional rights and for damages, this is a "state action," under 42 U.S.C. 1983, and this Court has jurisdiction of the parties and the subject matter, pursuant to 28 U.S.C. 1343(3) and (4). West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

In West Virginia, jurisdiction over student practice teachers is vested in its state board of education by Chapter 18, Article 2, Section 6, of the West Virginia Code, as amended. This statute, in pertinent part, reads as follows:

"The education of teachers in the State shall be under the general direction and control of the state board of education, which shall, through the state superintendent of schools, exercise supervisory control over teacher preparation programs in all institutions of higher education, including student teaching in the public schools, in accordance with standards for program approval stated in writing by the board. To give prospective teachers the teaching experience needed to demonstrate competence, as a prerequisite to licensure, the state board of education may enter into an agreement with county boards of education for the use of the public schools. Such agreement shall recognize student teaching as a joint responsibility of the teacher preparation institution and the cooperating public schools and shall include (1) the minimum qualifications for the employment of public school teachers selected as supervising teachers; (2) the remuneration to be paid public school teachers by the state board, in addition to their contractual salaries, for supervising student teachers; and (3) minimum standards to guarantee adequacy of facilities and program of the public school selected for student teaching. The student teacher, under the direction and supervision of the supervising teacher, shall exercise the authority of a substitute teacher.

"Institutions of higher education approved for teacher preparation may cooperate with each other and with one or more county boards of education in the organization and operation of centers to provide selected phases of the teacher preparation program such as student teaching or internship programs, instruction in methodology, seminar programs for college students, first year teachers and supervising teachers."

As may be seen under this statute, the state and county boards of education are authorized to enter into an agreement for the use of the public schools to give prospective teachers the teaching experience needed to demonstrate their competence as a prerequisite to becoming licensed teachers. In furtherance of this objective, the statute encourages institutions of higher learning to cooperate with each other and with the county boards of education to provide selected phases of teacher preparation for student teaching or internship programs. To become operative, the statutory

scheme contemplates a three-party agreement between the state board, the county boards and the colleges and universities. In this particular instance, the agreement was entered into on August 1, 1967, for the school year 1968–69, and it was signed by Rex M. Smith, State Superintendent of Schools, for the state board; by W. R. Cooke, Superintendent of Schools for Mercer County, for the county board; and by Harold A. Dock, authorized representative for Bluefield State College, the teacher training institution. This form agreement is in evidence and is set forth in its entirety in an appendix hereto attached. As is apparent therefrom, the arrangement between the parties was a voluntary undertaking, as contemplated by the statute, imposing no absolute obligation on any party and terminable by the joint will of the signatory parties. This is abundantly clear by the following paragraph of the agreement:

"The participants of this agreement understand that the student teaching program is voluntary on the part of any county and any school within the county, and that the extent of participation is established by joint decision between the representative of the teacher preparation institution and the county superintendent, with the approval of the principal where student teaching takes place. Finally, participants of this agreement may terminate it at the close of any supervisory period upon notice of intention submitted to the West Virginia Board of Education at least thirty days prior to the close of a supervisory period."

Thus, it is seen that admittance of students to do practice teaching in any particular county school system is determined by the joint decision of the county board and the college or university, with the approval of the principal of the school where the practice teaching is to take place. We can find no language in the statute or the agreement imposing upon the college or university any absolute duty to place any student in any particular county school system or requiring any county school board to accept for practice teaching any particular student or any specified number of students. The extent of the former's duty would appear to be limited to making a good faith effort to place those of its students majoring in education in an accredited school where they might do their practice teaching and thereby qualify for a degree in that field. The extent of the latter's duty would seem to require only that it not arbitrarily or capriciously refuse to accept any such students without just cause or reason. Accordingly, the plaintiff was subject to summary rejection with or without cause, so long as it was not in retribution for an exercise by him of some constitutionally protected right. Hodgin v. Noland, 435 F.2d 859 (4th Cir. 1970); Jones v. Hopper, 410 F.2d 1323 (10th Cir. 1969); Parker v. Board of Education, 237 F.Supp. 222; (D.Md.), aff'd 348 F.2d 464 (4th Cir. 1965). What, then, did the officials of Bluefield State College and/or the Mercer County Board of Education do or fail to do to perform their respective duties with respect to the plaintiff?

Let us first consider Bluefield State College. In the beginning, as we have seen, the officials of the college contacted those counties with which it had a working agreement in an endeavor to place plaintiff for his practice teaching experience. Having received unfavorable responses from these counties, the college officials contacted two other institutions of higher learning which had working agreements with other counties and enlisted their help in endeavoring to procure an accredited school in which plaintiff might take his practice teaching. These institutions were Marshall University, at Huntington (which had a working agreement with Logan County School Board, plaintiff's home county), and West Virginia State College, at Institute (which had a working agreement with Charleston Job Corps Center). Lo-

gan rejected plaintiff for the stated reason that it would not be in the best interests of its school system to accept him. However, the Charleston Job Corps Center, an institution which, according to the positive testimony of State Superintendent of Schools Rex M. Smith, is accredited by the West Virginia Board of Education for preparation of student teachers, did agree to accept plaintiff. He declined for reasons quite tenuous. The evidence, therefore, is clear and convincing that the officials of Bluefield State College acted in the utmost good faith in behalf of the plaintiff in the face of much provocation from him; in fact, it shows that they took extraordinary steps to place him in an acceptable institution to do his practice teaching. Had he accepted the fruits of their efforts and gone to the Charleston Job Corps Center, he could have completed the practice teaching requirement necessary for him to obtain a degree in education from Bluefield State College and to thereby qualify him to teach in the public schools of West Virginia. We accordingly find and conclude that the officials of Bluefield State College have acted in good faith and have fulfilled their obligation to plaintiff notwithstanding his assertions to the contrary.

We pass now to a consideration of the claim made against the Board of Education of Mercer County. Here, too, we can find no basis in the statute or the agreement to sustain the contention that the board was required, as a matter of law, to provide plaintiff a school in which to do practice teaching. However, we do find and so conclude that the plaintiff did have a discretionary privilege to be placed in an accredited school for such purpose, that is to say, he did have the right to expect and to receive at the hands of the officials of the Mercer County School Board the same con-

sideration with respect to his application for practice teaching in the schools of that county as was customarily given to other applications for that position.[7] This is a fundamental right, the protection of which is guaranteed by the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States. These clauses, considered together, simply mean that the rights of all persons must rest on the same rules and be similarly applied in like circumstances, and to this end, neither the state nor its several subdivisions or officials may engage in any discriminatory practices based upon race, color, creed or national origin, or deprive any person, under color of any state law or regulation, of his life, liberty or property without due process of law. This, then, raises the inquiry: Did the Mercer County school officials, in considering and acting upon plaintiff's application, employ a procedure, criteria or standards different from those customarily employed and applied to other applicants in like circumstances seeking a like position, and if so, did such employment have the effect of disqualifying plaintiff for the position for which he otherwise would have been qualified had they not used such procedure, criteria or standards? Counsel for the school officials concede in their brief that if this twofold question could be answered in the affirmative, then this Court should grant plaintiff appropriate relief, but they urge upon us that no such answer is warranted by the evidence in the case. With this we agree, unless, however, it can be said that plaintiff's character was irrelevant or that his rejection by the school officials on the basis of what they found to be his bad reputation was in derogation of the procedures, criteria and standards customarily followed and applied to other students in similar situations, thereby depriving him of due process and equal protection of the law.

---

7. That plaintiff was not placed in the county of his choice was not an unusual occurrence at Bluefield State College, for the evidence shows that other students, both white and black, had similar experiences.

We believe it can be fairly stated that the refusal of the school officials to accept plaintiff was solely predicated on his reputation as a militant on and off the campus and the publicity he had received linking him, both in fact and by inference, with much of the violent disturbances at the college, before and after the bombing incident,[8] notwithstanding plaintiff's assertion that such refusal was racially motivated.[9]

 We have no difficulty at all in concluding that character was a relevant factor and proper for consideration (infra p. 24, et seq.). But what of its evidential value and how may it be established? Professor Wigmore touches on the subject in this manner:

"There was perhaps a time when reputation alone was not regarded as admissible to prove character. There certainly was a time when the personal knowledge and opinion of acquaintances was regarded as a superior source of evidence. But at any rate, for more than two centuries, it has been settled that *reputation in the community is a proper source of evidence.* (Emphasis added).

Wigmore on Evidence (3rd Ed. 1940, Sec. 1610).

In a civil action where the character of a party becomes the crucial issue in the case, evidence of general reputation is admissible as an exception to the hearsay rule. Wigmore on Evidence (3rd Ed. 1940), Sec. 54; 29 Am. Jur.2d (Evidence), Sec. 337. And it has long been the rule that character reputa-

tion is established not by what one *knows* to be fact concerning another, but by what one has *heard* in the community concerning such other. Michelson v. United States, 335 U.S. 469, at 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948); United States v. Longfellow, 406 F.2d 415 (4th Cir. 1969); Wigmore on Evidence (3rd Ed. 1940), Sec. 1609 and 1964 Supplement. Nor is good character presumed. When one's character is maligned one must defend it, else one must suffer the consequences. Greer v. United States, 245 U.S. 559, 38 S.Ct. 209, 62 L.Ed. 469 (1918).[10] Such being the rule in judicial proceedings, we apprehend no sound reason why it should not also prevail in administrative and quasi-judicial proceedings as well. But be that as it may, since this Court has heard the case upon its merits, *de novo*, and may make its own determination upon the basis of the evidence adduced before it, the contention that the plaintiff was denied due process at the school level is moot. Barker v. Hardway, 399 F.2d 638 (4th Cir. 1968). Undoubtedly, the character of a potential teacher of school children of immature years is a proper concern of those charged with the responsibility of educating the young and it is likewise a proper concern of the courts in determining whether or not school officials properly perform this function. The traditional manner of performing this function is by ascertaining the general opinion of the community concerning the general reputation of the party in question. This, of course, comprehends the receipt of hearsay. However, there is nothing peculiarly novel about this. In-

---

8. In fairness, it must be noted that plaintiff was never charged with, or convicted of, any of the other disturbances on the campus to which he was linked by publicity and otherwise. He maintains that all his activities, on and off the campus, were lawful and in the exercise of his right to freedom of speech and assembly guaranteed by the First Amendment.

9. As set out in Findings of Fact No. 19, the charge that the decision of the school officials was racially motivated is not

supported by a scintilla of evidence. To the contrary, the evidence shows that Mercer County has placed, and continues to place, many black student teachers in their public schools—in fact, a disproportionate number according to the ratio of black-white student population.

10. Here the record fails to reveal any effort by the plaintiff to have the news media correct or retract any of the unfavorable publicity.

deed, much of our daily activity has for its motivation some elements of hearsay, the most striking example being our adherence to the teachings of Christ. In carrying out this responsibility, the law does require that school officials follow customary procedures and apply uniform guidelines and standards in a reasonable and non-discriminatory manner. This requirement does not appear to have been violated. Mercer County Superintendent of Schools W. R. Cooke testified that he rejected plaintiff upon the basis of adverse publicity he had received, while a student at Bluefield State College, through the newspapers, radio and television, from what he termed "dozens and dozens" of telephone calls from school patrons asking that plaintiff not be taken as a student teacher, and from what he and the members of his staff had heard from others in the community regarding plaintiff's activities and conduct, which, in his opinion, characterized plaintiff as one being unfit to teach school children. Mr. Cooke testified that he had no reason to disbelieve the accuracy of these reports.

Having carefully examined the twelve newspaper articles in evidence and having considered all the testimony bearing on the subject, this Court has no difficulty in finding that they do afford a reasonable hypothesis for the school officials to conclude, as they did, that plaintiff would not be a fit and proper person, characterwise, to be entrusted with the important task of teaching the young in their county. As was pointed out by this Court in Barker v. Hardway, supra, 283 F.Supp. at p. 237:

> "(T)he law indulges the presumption that school authorities act reasonably and fairly and in good faith in exercising the authority with which it clothes them, and casts the burden on him who calls their conduct into question to show that they have not been actuated by proper motives."

The plaintiff's evidence not only fails to rebut this presumption, but it likewise fails to prove that Mr. Cooke and his associates, in reaching their decision in plaintiff's case, departed in any way from their standard procedure in such matters or that their decision was based upon considerations other than what they honestly believed at the time to be in the best interests of the school system which they were charged with administering. Nor can it be gainsaid that the State has a legitimate interest in the quality, integrity and efficiency of its public schools in furtherance of which it is not only the responsibility but also the duty of school administrators to screen those who would be entering the teaching profession to see that they meet this standard. In doing this, any conflict arising between the two will be balanced, with the interests of the State serving as the guiding principle. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Roberts v. Lake Central School Corporation, 317 F.Supp. 63 (N.D.Ind.1970). Applying this principle to the facts and circumstances of the instant case, one can only assume that any prudent person facing a like situation would have acted as did the school officials of Mercer County. This Court, therefore, would be unwarranted in substituting its own judgment for that of the school officials, rather it must judge the constitutionality of their action on the basis of the facts and circumstances before them. Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966). So viewed, we conclude that the decision reached had a rational basis in law and fact and is one which the school officials, in the exercise of sound discretion, had the right to make. Thus, no constitutional infringement is perceived.

We have been cited to no decisional law and we have found none defining the character credentials necessary for a student practice teacher to have as a prerequisite to engaging in practice teaching, but there is authority in this field as to what is required of teachers and those seeking teaching positions as a means of employment. Since we believe

it may fairly be presumed that the end objective of one majoring in education and seeking a position as a practice teacher is to become employed as a teacher, the character credentials expected to be possessed by teachers should be relevant to those applying for student teaching positions. We now look to the pertinent state statutes bearing on the subject.

Chapter 18, Article 2, Section 6, of the Code of West Virginia provides in part that,

> "The student teacher, under the direction and supervision of the supervising teacher, shall exercise the authority of a substitute teacher."

Chapter 18A, Article 3, Section 1, of the Code of West Virginia reads in part as follows:

> "A certificate to teach shall not be granted to any person who is not a citizen of the United States, is not of good moral character and physically, mentally and emotionally qualified to perform the duties of a teacher * * *."

Chapter 18A, Article 2, Section 8, of the West Virginia Code provides in part that,

> "Notwithstanding any other provision of law, a board may suspend or dismiss any person in its employment at any time for: Immorality, incompetency, cruelty, insubordination, intemperance or wilful neglect of duty * * *."

No reason is apparent to this Court, and none has been pointed out by counsel, why these statutory requirements applying to regular and substitute teachers should not be applied analogously to a student teacher. Hence the following decisions are pertinent:

In Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952), the Supreme Court said:

> "A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted."

This reasoning was followed by the Supreme Court in Beilan v. Board of Public Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958). The same Court, in Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), reiterated that,

> "There can be no doubt of the right of a State to investigate the competence and fitness of those whom it hires to teach in its schools."

At the lower-court level, somewhat the same position has been maintained, for example, in Smith v. Board of Education, 365 F.2d 770 (8th Cir. 1966), it was said,

> "Nothing contained in this opinion is intended to be restrictive of a school board's freedom to make full inquiry and to give due consideration to an applicant's (teacher's) qualifications and the district's needs in filling vacancies so long as the board does not act unreasonably, arbitrarily, capriciously, or unlawfully."

In Jenkyns v. Board of Education, 111 U.S.App.D.C. 64, 294 F.2d 260 (1961), it was held that a school principal could be dismissed for conduct against morality, even though he had been tried for such offense and found not guilty. There the Court said that the plaintiff must show that the board acted capriciously in the dismissal. Surely the test would not be less stringent for one who was not yet employed.

In Teel v. Pitt County Board of Education, 272 F.Supp. 703 (E.D.N.C.1967), the Court said that, while a school board must use non-racial criteria in the selec-

tion of new teachers, the criteria of personality, age, general appearance, attitude, *reputation,* recommendations and references were proper areas of consideration.

In Johnson v. Branch, supra, the Court stated that a teacher does not have a constitutional right to job employment or to a renewal of a contract and that a school board has a wide discretion in such matters. Nevertheless, that Court was careful to point out that this discretion must not be exercised in such a manner as to cause racial discrimination.

 The plaintiff also asserts abridgment of his right to freedom of speech and assembly guaranteed by the First Amendment. The right of fair comment toward public officials was made clear by the Supreme Court under analogous circumstances in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This Court finds, however, that here the plaintiff has transgressed the protected limits of the privilege afforded him under the law. In other words, certain of his statements and actions, as shown by the evidence,[11] went beyond legitimate criticism and protest protected by the First Amendment. The record is clear that these statements and actions were violently abusive and personally defamatory toward both the officials of Bluefield State College and the Board of Education of Mercer County, were completely uncalled for under the circumstances, and were designed to and did produce many of the disruptions and disturbances and much of the property destruction at Bluefield State College. The

right of free speech is not absolute; it must be exercised responsibly. The First Amendment does not confer a license to trample upon the rights of others, Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); Baines v. City of Danville, 337 F.2d 579 (4th Cir. 1964), or to persuade others to violate the law, Fox v. Washington, 236 U.S. 273, 35 S.Ct. 383, 59 L.Ed. 573 (1915); Bullock v. United States, 265 F.2d 683, cert. den. 360 U.S. 909, 932, 79 S.Ct. 1294, 3 L.Ed.2d 1260, rehearing den. 361 U.S. 855, 80 S.Ct. 46, 4 L.Ed.2d 95 (6th Cir. 1959), or to destroy property, American Federation of Musicians v. Stein, 213 F.2d 679, cert. den. 348 U.S. 873, 75 S.Ct. 108, 99 L.Ed. 687 (6th Cir. 1954), or to utter threatening words, Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), or to cause a panic or riot, Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). As indicated by these decisions, plaintiff's conduct in threatening the life of Harold Dock, challenging Lloyd Davis to physical combat, uttering threatening and abusive words and issuing inflammatory bulletins inciting others to violence on the campus and the destruction of school property was clearly beyond the limits of his First Amendment privileges, and we find that the efforts put forth and actions taken by the college authorities to curb him in such conduct were within permissible limits and constituted no unconstitutional abridgment of his right to freedom of speech and assembly.

Remaining to be considered is the allegation that the defendants conspired to

11. Plaintiff's threatening the life of Harold Dock, Director of Student Teachers, if he did not change his practice teaching assignment from Tazewell County; his challenging Lloyd Davis, security officer, to physical combat because he had immobilized his (plaintiff's) car for being parked in violation of college parking regulations; his issuing inflammatory bulletins obviously designed to incite fellow black students to violence; his speech and manner which had adverse psychological

effect on others, resulting in a threatening letter being sent to Dr. Hardway, the college president (see footnote 3), someone sending a similar threat to Mr. Dock, the placing of dynamite at the home of Mr. Davis, the throwing of a rock through the window of Dr. Hardway's residence, the bombing of the physical education building, and many other acts of destruction of college property and disturbances and disruptions of normal school activities on campus.

deprive the plaintiff of his right or privilege to do his practice teaching in Mercer County. This ground for relief was not briefed by counsel for the plaintiff and we assume it has been abandoned. But, be that as it may, the record is devoid of any evidence tending to establish a conspiracy by the defendants to deprive the plaintiff of any right or privilege.

Therefore, having found as a matter of fact and having concluded as a matter of law, upon the basis of the record before us, that the plaintiff has failed to show entitlement to any of the relief sought in this action, an order will be prepared and entered dismissing the complaint and this action, with costs to the defendants.

### APPENDIX

Code: Ch. 18, Art. 2, Sec. 6 8/1/67

### STUDENT TEACHING AGREEMENT

Under the provisions of Chapter 18, Article 2, Section 6 of the Code of West Virginia, one thousand nine hundred thirty-one, as amended in one thousand nine hundred sixty-three, implemented by regulations passed by the West Virginia Board of Education on September four, one thousand nine hundred sixty-three, titled *Standards for Student Teaching,* the West Virginia Board of Education and the Board of Education of the County of Mercer, West Virginia concur with the conditions set forth in this agreement for the use of the public schools of said county in establishing and maintaining the program of student teaching required of students completing an approved program of teacher education in West Virginia colleges and universities.

The participants of this agreement recognize that the fulfillment of its provisions is the joint responsibility of the teacher preparation institution and the cooperating schools of the county under the supervisory control of the State Superintendent of Schools who may require such records and reports as are necessary to determine compliance with the purpose of this agreement and the evaluation of the student teaching programs.

The participants of this agreement understand that the student teaching program is voluntary on the part of any county and any school within the county, and that the extent of participation is established by joint decision between the representative of the teacher preparation institution and the county superintendent, with the approval of the principal where student teaching takes place. Finally, participants of this agreement may terminate it at the close of any supervisory period upon notice of intention submitted to the West Virginia Board of Education at least thirty days prior to the close of a supervisory period.

The parties of this agreement shall conduct the program of student teaching in accordance with the following standards approved by the State Board of Education.

### I. THE STUDENT TEACHING PROGRAM

The student teaching program shall:

1. Be designed to assist teachers, school administrators, and college supervisors in understanding their roles in the laboratory phases of teacher education and to improve their competence and skill in performing their roles.

2. Be planned to assure the cooperating county board of education that:

 a. Prospective teachers assigned to the school designated as a teacher preparation laboratory are selected through rigorous application of institutional standards which are designed to admit to student teaching only those persons who are well qualified.

 b. Each student teacher accepts the principle that the welfare of the

boys and girls in the school must come first at all times and that the student teaching arrangement is dependent on the principle.

c. Each student teacher recognizes that he is permitted to carry the delegated responsibilities of the student teacher only so long as his personal and professional conduct under the immediate direction of his supervising teacher and principal merits this consideration.

3. Be under the direction of a person employed specifically for the purpose of supervising student teachers.

4. Insure each student teacher full-time supervision by the supervising teacher, the college staff, and the staff of the superintendent of schools for a period of not less than eight weeks.

## II. THE SUPERVISING TEACHER

1. *The Role of the Supervising Teacher*

A supervising teacher is defined as a teacher who, in addition to his regular teaching assignment, is directly responsible for supervising the student teaching experiences of a student enrolled in a West Virginia institution of higher education accredited for teacher preparation.

The supervising teacher shall retain full authority over all aspects of the school's program (e. g., instruction, discipline, and pupil evaluation), delegating responsibility to the student teacher on a temporary basis only. At such times the student teacher shall exercise the legal authority of a substitute teacher.

The supervising teacher shall be in his classroom the optimum amount of time necessary to assure the most successful educational experience for the students and the student teacher. His absences from the classroom shall be carefully planned in accordance with the needs of the pupils and the demonstrated competence of the student teacher.

2. *The Characteristics of the Supervising Teacher*

Eligibility to serve as a supervisor of student teachers shall be based on the judgment that the teacher has professional qualities which distinguish him as a person who is a superior teacher in his own right in that he:

a. Is basically a learner, striving always to improve his ability to carry out his tasks.

b. Possesses a positive professional attitude and real respect and liking for teaching.

c. Will be a cooperative participant in the total school program and in the teacher education program.

d. Will be able to work effectively with other teachers, parents, student teachers, and college supervisors.

e. Will be able to assist the student teacher in the development of his skill and self-evaluation, and will be able to make an objective evaluation of the progress of the student teacher in order to document for the college supervisor the strengths and weaknesses of the student.

3. *The Process of Selection*

In selecting supervising teachers the representative of the county superintendent and the college shall give preference to teachers in the successively higher categories of professional preparation, but in every situation final judgment shall be based on the previously stated "characteristics of the supervising teacher."

Each supervising teacher shall be selected by the college or university from an annual list of regularly em-

ployed members of the teaching staff of the county which enters into an agreement with the West Virginia Board of Education for the training of student teachers. This listing of eligible supervising teachers shall be the joint responsibility of (1) the county superintendent of schools, and (2) the designated representative of the cooperating institution of higher education. The list of eligible supervising teachers shall be certified jointly by the county superintendent and institutional representative and submitted to the State Superintendent of Schools within thirty days following the beginning of *each* supervisory period.

4. A Professional Certificate may be endorsed for serving as a *Teacher Education Associate* provided:

1. The applicant

a. Holds a standard professional certificate based on an approved program of teacher preparation and endorsed for the specialization(s) and/or the grade level(s) appropriate to his assignment as a supervisor of student teachers.

b. Has completed the requirements for a master's degree.

c. Has completed a graduate program consisting of:

(1) Fifteen (15) or more semester hours of course work selected for its relevancy to his assignment as a supervising teacher: specializations for departmental teaching, for teaching in a self-contained classroom, or for teaching early childhood.

(2) Three (3) or more semester hours in the principles of supervision or in curriculum development.

(3) Three (3) or more semester hours in the supervision of student teachers. (To use this credit for the *Teacher Education Associate* endorsement, it must have been acquired by a teacher who had served, was serving, or was nominated to serve as a supervising teacher at the time of his enrollment for the course.)

d. Has completed five years of successful teaching experience, two of which shall have been in one of the following:

(1) For secondary teachers in the area(s) of specialization.

(2) For elementary teachers in a self-contained classroom.

(3) For teachers of nursery-kindergarten.

e. Has supervised successfully two student teachers.

f. Has been recommended by the institution where he has completed a minimum of six (6) semester hours, including a course in the supervision of student teachers.

5. *Minimum Requirements for Employment*

In case a position cannot be filled by a teacher holding the Teacher Education Associate endorsement, permission to supervise student teachers may be granted annually to an apprenticed supervisor provided he (1) meets requirements described under the standards for "The Selection of the Supervising Teacher," and (2) holds a standard professional certificate, based on an approved program of teacher preparation, which is endorsed for specialization(s) and grade level(s) in which supervision takes place and provided further that for a *Class A Listing* the apprenticed supervising teacher shall have completed a minimum of:

a. Twelve (12) hours on the graduate level to consist of:

(1) A course in principles of supervision and/or curriculum development.

(2) Courses in the area of specialization in which he supervises student teachers (elementary and secondary).

b. Four or more years of successful teaching experience, two of which shall be in the specialization(s) and/or the grade level(s) in which he will be supervising student teachers.

For a *Class B Listing* the apprenticed supervising teacher shall have two or more years of successful teaching experience, one of which shall be in the specialization(s) and/or at the grade level(s) in which supervision takes place.

## III. THE DIRECTORS AND COLLEGE SUPERVISORS OF STUDENT TEACHING

The director and/or college supervisor of student teaching shall:

1. Be employed because of his demonstrated ability to teach and to direct the laboratory experiences of prospective teachers. Their experience shall include teaching in a public school system.
2. Serve as liaison between the college, the county, and the State Department of Education.
3. Be responsible for arranging periodic group conferences with college personnel, and/or the personnel employed by the county, and to aid in the evaluation of such conferences.
4. Observe student teaching and confer with each supervising teacher a minimum of three times at reasonable intervals during the student teaching period.

## IV. THE SCHOOL AS A CENTER FOR OBSERVATION AND STUDENT TEACHING

Schools used as centers for observation and for student teaching shall be selected jointly by the county superintendent of schools, after consultation with his supervisory staff and cooperating principals, and the college representative.

Each school selected as a center for observation and student teaching shall:

1. Have administrative and instructional leaders at the county level who are genuinely interested in the preparation of teachers and who will cooperate with the college in the teacher education program.
2. Have a faculty composed of competent teachers who have a high sense of commitment to the values which give integrity to teaching and a personal desire to participate in the student teaching program.
3. Have a principal and faculty who will accept the responsibility of interpreting to the community the importance of the school's role in the improvement of public education.
4. Include those grades, courses, and special groups that a student teacher may be required to teach according to the program he is completing and the certificate for which he is working.
5. Have administrators and teachers who encourage experimentation and innovation.
6. Meet satisfactory standards of safety, heating, lighting, and ventilation.
7. Be equipped with an adequate library and up-to-date instructional aids (e. g., maps, globes, charts, and audio-visual equipment).
8. Hold first class accreditation by the State Department of Education. In selecting secondary school centers preference shall be given to schools which are accredited by the North Central Association of Colleges and Secondary Schools.

In conformity with the provisions previously stated in this document the un-

**236**

dersigned agree to participate in the West Virginia Program of Student Teaching during the school year of 1968–69:

_Harold A. Dock_
Institutional Representative

for _Bluefield State College_ _Sept. 30, 1968_
Teacher Preparation Institution Date

_W. R. Cooke_
County Superintendent of Schools for
the Board of Education of the County of _Dec. 6, 1968_
Date
_Mercer_ , West Virginia

_Rex M. Smith_
State Superintendent of Free Schools for
the West Virginia Board of Education Date
[A3620]