PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RONDA EVERETT; MELISSA GRIMES;
SUTTON CAROLINE; CHRISTOPHER W.
TAYLOR, next friends of minor
children attending Pitt County
Schools; THE PITT COUNTY
COALITION FOR EDUCATING BLACK
CHILDREN,

        *Plaintiffs-Appellants,*

        and

JUVENILE FEMALE 1; THE
GREENVILLE PARENTS ASSOCIATION,

        *Intervenors/Plaintiffs,*

        v.

THE PITT COUNTY BOARD OF
EDUCATION, public body corporate,

        *Defendant-Appellee.*

No. 11-2000

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Malcolm J. Howard, Senior District Judge.
(6:69-cv-00702-H)

Argued: January 26, 2012

Decided: May 7, 2012

Before NIEMEYER, WYNN, and DIAZ, Circuit Judges.

Vacated and remanded by published opinion. Judge Wynn wrote the majority opinion, in which Judge Diaz concurred. Judge Niemeyer wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Mark Dorosin, UNIVERSITY OF NORTH CAROLINA CENTER FOR CIVIL RIGHTS, Chapel Hill, North Carolina, for Appellants. Kenneth Alexander Soo, THARRINGTON SMITH, LLP, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Elizabeth Haddix, UNIVERSITY OF NORTH CAROLINA CENTER FOR CIVIL RIGHTS, Chapel Hill, North Carolina, for Appellants. Deborah R. Stagner, THARRINGTON SMITH, LLP, Raleigh, North Carolina, for Appellee.

## OPINION

WYNN, Circuit Judge:

In 2010, Appellants[1] unsuccessfully sought to enjoin the implementation of the 2011-2012 student assignment plan ("2011-2012 Assignment Plan") by the Pitt County Board of Education ("School Board" or "Appellee"[2]). On appeal, Appellants argue that the district court committed legal error by failing to apply, and requiring the School Board to rebut, a presumption that racial disparities in the 2011-2012 Assignment Plan resulted from the School Board's prior unconstitutional conduct in operating a racially segregated school

---

[1]Appellants comprise parents of minor children attending schools in Pitt County and the Pitt County Coalition for Educating Black Children.

[2]Appellee, the consolidated "Pitt County Board of Education," was formed following the merger of boards of education of Pitt County and Greenville City in 1986, and is the successor in interest of the original school board defendants.

district. We agree and, therefore, vacate the district court's order and remand for reconsideration consistent with this opinion.

## I.

### A.

In the wake of *Brown v. Board of Education*, 347 U.S. 483 (1954), hundreds of school districts in the United States became, and remain today, subject to school desegregation orders issued by federal courts. *See, e.g.*, UNITED STATES COMMISSION ON CIVIL RIGHTS, BECOMING LESS SEPARATE? SCHOOL DESEGREGATION, JUSTICE DEPARTMENT ENFORCEMENT, AND THE PURSUIT OF UNITARY STATUS 1-2 (2007). As a condition precedent to lifting these desegregation orders, school districts must: (1) comply in good faith with the orders; (2) eliminate the vestiges of former de jure segregation to the maximum extent practicable; and (3) be adjudicated, by a federal court, as operating racially "unitary"—as opposed to "dual"—school systems. *Bd. of Educ. v. Dowell*, 498 U.S. 237, 248-50 (1991). Notably, prior to being declared "unitary" by a federal court, school districts operate under an affirmative obligation to eliminate unconstitutional dual school systems, as well as under a rebuttable presumption that any current racial disparities are the result of past unconstitutional conduct. *School Bd. v. Baliles*, 829 F.2d 1308, 1311 (4th Cir. 1987); *N.A.A.C.P., Jacksonville Branch v. Duval Cnty. Sch.*, 273 F.3d 960, 966 (11th Cir. 2001) ("*Jacksonville N.A.A.C.P.*").

### B.

In the 1960s, the United States District Court for the Eastern District of North Carolina determined that the School Board was operating a racially segregated dual school district in violation of students' rights to equal protection under the law as guaranteed by the Fourteenth Amendment to the

United States Constitution. *See Edwards v. Greenville City Bd. of Educ.*, Civ. A. No. 702; *Teel v. Pitt Cnty. Bd. of Educ.*, Civ. A. No. 569. Subsequently, the district court approved desegregation plans that, through busing and other means, were designed to "eliminate the racial identity" of schools within the district. J.A. 34. Among other mandates and instructions in the desegregation orders, the district court specifically ordered the School Board in *Teel* "to the extent consistent with the proper administration and operation of the school system, [to] locate any new school or addition with the objective of eradicating the vestiges of the dual school system and of eliminating the effects of segregation." J.A. 36-37. In 1972, the district court ordered *Edwards* and *Teel* administratively closed and removed from the court's active docket, subject to being reopened whenever a pleading was filed in either case to warrant reopening. For over thirty years, although the School Board remained subject to the *Edwards* and *Teel* desegregation orders, the actions remained dormant.

C.

In 2006, the Greenville Parents Association filed a complaint with the Office of Civil Rights within the United States Department of Education objecting to the School Board's use of race in its student assignment plan for the 2006-2007 academic year ("2006-2007 Assignment Plan"). The 2006-2007 Assignment Plan was adopted under the School Board's Policy 10.107 for school attendance areas ("Policy 10.107"). Policy 10.107 obliged the School Board to balance several factors "to the degree possible" when drawing school attendance areas, including "student proximity to facilities" and a "racial balance" defined by the policy as a student population in which no one race constituted more than seventy percent of the students at a given school. J.A. 44. To this end, the 2006-2007 Assignment Plan "used satellite school districts and a

racial balance ratio in an effort to reduce the racial isolation of elementary schools" in the school district.[3] J.A. 79.

In March 2008, as part of the School Board's settlement of the Office of Civil Rights complaint, the School Board filed a motion requesting that the district court approve: (1) the 2006-2007 Assignment Plan; and (2) a revised version of Policy 10.107 ("Revised Policy 10.107"), which proposed to reduce the School Board's reliance on race as a factor by replacing the prior policy's explicit racial balancing with a definition of "student diversity" that balanced a number of factors, including student achievement, socio-economic status, and ethnic, racial and educational sub-groups.[4] The Greenville Parents Association, as a plaintiff-intervenor in the litigation, filed a motion requesting the district court's denial of the 2006-2007 Assignment Plan and Revised Policy 10.107, as well as the district court's declaration of the school district's "unitary status," which, as a consequence, would have lifted the desegregation orders in *Edwards* and *Teel*. The district court reopened and consolidated the *Edwards* and *Teel* cases and ordered discovery.

Early in the discovery period, the parties participated in court-ordered mediation resulting in a settlement. As part of the settlement, the Greenville Parents Association agreed to withdraw its motion with the district court for a declaration of the school district's unitary status, and the School Board agreed to involve Appellants and the Greenville Parents Asso-

---

[3]As of 2005, a number of elementary schools in the school district remained racially identifiable. For example, the student body at Sadie Saulter was 95.1% African-American and only 1.7% White.

[4]Although the School Board conceded the existence of "continuing racial isolation of certain schools in Pitt County," the School Board asserted that "it was justified in revising its Policy 10.107 to make student achievement and socio-economic status factors" in student diversity because the School Board's previous efforts at using racial balancing "resulted in less racial and socio-economic diversity in some of [its] elementary schools." J.A. 50.

ciation in the planning and discussion stages of the 2011-2012 Assignment Plan. On November 4, 2009, the district court issued an order approving the settlement ("2009 Consent Order"), which included the district court's determination that the 2006-2007 Assignment Plan and Revised Policy 10.107 "were [issued] by the School Board in good faith compliance [with] the remedial plans approved by this court's 1970 desegregation orders." J.A. 87.

The 2009 Consent Order obligated the parties to "work toward attaining unitary status so that the [district] court may relinquish jurisdiction over this case and restore to the School Board full responsibility for the operation of its schools." J.A. 89. Accordingly, the 2009 Consent Order directed the parties to submit, on or before December 31, 2012, "a report detailing the School Board's efforts and progress in achieving unitary status and eliminating the vestiges of past discrimination to the extent practicable." J.A. 89.

D.

In 2010, the School Board began developing, and ultimately selected, the 2011-2012 Assignment Plan, which was needed to accommodate: the opening of a new elementary school ("Lakeforest Elementary"); the conversion of an existing elementary school into a pre-kindergarten program; and overcrowding at existing middle schools. The School Board, with the assistance of an independent consultant, designed student assignment proposals in accordance with the following criteria: (1) school proximity; (2) building capacity; (3) academic proficiency; and (4) impact area.[5] Notably, rather than utilizing "race" or "student diversity" as defined in Revised Policy 10.107, consideration of diversity in the proposals was limited to measures of "student achievement." J.A. 147.

---

[5]With respect to the fourth factor, the School Board directed the independent consultant to consider only fourteen of the thirty-six schools in the district.

As required by the settlement agreement, the School Board invited Appellants to discuss the student assignment proposals during two retreats. Initially, the parties considered two student assignment scenarios: one using only proximity and capacity as criteria ("Scenario 1"); and the other using student achievement in addition to proximity and capacity ("Scenario 2"). Whereas Scenario 1 projected a relative increase in racially-identifiable schools with lower student achievement, Scenario 2 projected better diversity but a relative increase in satellite neighborhoods, which, presumably, would have required more satellite busing. After discussion of these two scenarios, a third student assignment plan was considered, which, while retaining Scenario 2's consideration of student achievement, limited the number of satellite neighborhoods by prioritizing proximity ("Scenario 3"). Scenario 3 projected more racial diversity than Scenario 1, less racial diversity than Scenario 2, and fewer satellite areas than Scenario 2.

On November 15, 2010, the School Board selected Scenario 3 as its 2011-2012 Assignment Plan. Prior to the School Board's adoption of Scenario 3, the Appellants urged the School Board to adopt Scenario 2 because Scenario 2 projected the best outcomes for student achievement and diversity. The School Board was specifically asked, "how can we open a new elementary school [Lakeforest Elementary] that is racially identifiable with low performance . . . and follow [the] Court Order?" J.A. 188. Appellants urged the School Board to consider "the impact [that] this [assignment] decision will make [on the district court's determination of] unitary status," and Appellants further asserted that Scenario 2 "created the least amount of personal bias" and "the most equitable picture considering all factors." J.A. 189, 193.

After the School Board's adoption of Scenario 3 as the 2011-2012 Assignment Plan, Appellants urged the School Board to reconsider its decision because, according to Appellants, the 2011-2012 Assignment Plan's increase in racially-identifiable schools with low student achievement moved the

school district further away from unitary status. Appellants advised the School Board to seek the district court's guidance regarding whether the 2011-2012 Assignment Plan complied with existing desegregation orders. The School Board declined to revisit its adoption of Scenario 3 or to seek guidance from the district court.

E.

On April 15, 2011, Appellants sought the district court's intervention by filing a motion for injunctive and other relief. Appellants' motion alleged that the 2011-2012 Assignment Plan violated the district court's existing desegregation orders because it: (1) established Lakeforest Elementary as a racially identifiable, low-achieving school, further stigmatizing students and aggravating the vestiges of racial segregation and discrimination; (2) failed to address imbalances in existing racially-identifiable schools because only fourteen of the thirty-six schools in the school district were included in the "impact area"; (3) was adopted despite the existence of less discriminatory alternatives; and (4) "mov[ed] the [school] district further away from unitary status in contravention of" the 2009 Consent Order. J.A. 100. Appellants sought an order "to stop implementation of this regressive student reassignment," as well as an order requiring the School Board "to submit for judicial review . . . a[n] assignment plan which moves the district towards unitary status." J.A. 100-01.

The School Board, on the other hand, urged the district court to deny Appellants' motion, arguing that: (1) the School Board followed the Revised Policy 10.107 in adopting the 2011-2012 Assignment Plan and, therefore, its actions constituted a reasonable, good faith effort to achieve diversity goals and maintain progress toward the school district's attainment of unitary status; (2) Appellants' motion was premature because the 2009 Consent Order set a timetable of December 2012 for considering the school district's progress toward unitary status; and (3) halting implementation of the 2011-2012

Assignment Plan would create an undue burden on the school system.

On August 16, 2011, four months after Appellants' motion was filed and just nine days before the start of the school year, the district court issued its order denying Appellants' motion. The district court characterized Appellants' motion as a request for a preliminary injunction and held that the Appellants did "not demonstrate[ ] a likelihood of success on the merits of their claim so as justify the extraordinary relief they request." J.A. 375. The district court also found that granting Appellants' motion would result in irreparable harm because of the "disruption to the administration" of the schools within the school district. J.A. 376. Finally, the district court held that equities tipped in favor of denying Appellants' motion because the district court anticipated a review of the school district's progress toward unitary status in December 2012. Appellants filed a timely notice of appeal.

## II.

## A.

As an initial matter, the School Board claims that this Court lacks jurisdiction over this appeal. Specifically, the School Board argues that the district court's denial of Appellants' motion is not a "final order" pursuant to 28 U.S.C. § 1291 because the district court "has expressed its clear intention to take up the issue of unitary status after submission of the parties' reports no later than 31 December 2012." Appellee Br. at 14-15. We initially note that a request for the parties to submit "a report" is not at all a clear indication that the district court will fully and finally resolve the issue of unitary status in December 2012.

Further, we reject the School Board's jurisdictional argument. First, 28 U.S.C. § 1292(a)(1) provides this Court with jurisdiction over district court decisions "granting, continuing,

modifying, refusing or dissolving injunctions." *See also Liddell v. Bd. of Educ.*, 693 F.2d 721, 724 (6th Cir. 1981) ("We conclude that the challenged orders" approving aspects of a desegregation plan "are presently appealable because they amount to mandatory injunctions under 28 U.S.C. § 1292(a)(1)."). Second, as further discussed below, even if we assume that the district court will fully consider the issue of unitary status in December 2012, this does not absolve the School Board from the burden of demonstrating to the district court, as *Green v. Cnty. Sch. Bd.*, 391 U.S. 430 (1968), and its progeny require, that the 2011-2012 Assignment Plan moves the school district toward unitary status, particularly where this plan allegedly causes immediate and substantial adverse effects on students. *See, e.g.*, *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 538 (1979) (holding school board bears the "heavy burden of showing that actions that increased or continued the effects of the dual system serve important and legitimate ends" (quotation marks omitted)). Any other conclusion would necessarily, but impermissibly, provide the School Board with latitude to discriminate pending the resolution of some future hearing.

B.

We review a district court's order on a motion for injunctive relief for an abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo. *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 125 (4th Cir. 2011). A court "has abused its discretion if its decision is guided by erroneous legal principles." *Brown v. Nucor Corp.*, 576 F.3d 149, 161 (4th Cir. 2009) (quotation marks omitted). "No deference . . . is owed to the district court on conclusions of law, including the district court's understanding of controlling law or the various burdens of proof and presumptions; . . . such conclusions of law are reviewed de novo." *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 379 (4th Cir. 2001) (en banc) (Motz, J. and King, J., con-

curring in part, dissenting in part) (citing *In re Brice*, 188 F.3d 576, 577 (4th Cir. 1999)).

On appeal, Appellants argue that the district court committed legal error by failing to apply, and requiring the School Board to rebut, a presumption that any racial disparities in the 2011-2012 Assignment Plan resulted from the School Board's prior unconstitutional conduct in operating a racially segregated school district before 1970. We agree.

## C.

"It is well established that once a court has found an unlawful dual school system, the plaintiffs are entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the defendants." *Baliles*, 829 F.2d at 1311; *see also Freeman v. Pitts*, 503 U.S. 467, 494 (1992) ("The school district bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation."); *Jacksonville N.A.A.C.P.*, 273 F.3d at 966 ("Since the Board operated *de jure* segregated schools in the past, there is a presumption that any current racial disparities in these areas are the result of its past unlawful conduct."); *Green*, 391 U.S. at 439 ("It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state imposed segregation."); *cf. United States v. Fordice*, 505 U.S. 717, 745 (1992) (Thomas, J., concurring) (acknowledging that the Supreme Court's "decisions following *Green* [have] indulged the presumption, often irrebuttable in practice, that a presently observed imbalance has been proximately caused by intentional state action during the prior *de jure* era"); *Freeman*, 503 U.S. at 505 (Scalia, J., concurring) (acknowledging that the Supreme Court's "post-*Green* cases provide that, once state-enforced school segregation is shown to have existed . . . there arises a presumption, effectively irrebuttable (because the school district cannot prove the negative), that any current racial imbalance is the product

of that violation."). "[I]n school desegregation cases th[is] burden does not shift back to the plaintiffs until the school system achieves unitary status."[6] *Baliles*, 829 F.2d at 1311.

The existence of this evidentiary burden does not preclude school boards from implementing new desegregation plans or modifying existing plans. *Clark v. Bd. of Educ.*, 705 F.2d 265, 271 (8th Cir. 1983). However, "the [school] board must show that the proposed changes are consistent with its continuing affirmative duty to eliminate discrimination." *Riddick v. Sch. Bd.*, 784 F.2d 521, 535 (4th Cir. 1986); *see also Brinkman*, 443 U.S. at 538 (explaining that the school board of a pre-unitary district bears the "heavy burden of showing that actions that increased or continued the effects of the dual system serve important and legitimate ends" (quotation marks omitted)); *Green*, 391 U.S. at 439 ("[T]he availability to the [school] board of other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden upon the [school] board to explain its preference for an apparently less effective method."). Again, "[t]his presumption [only] ends once the school district has achieved unitary status." *Baliles*, 829 F.2d at 1311.

---

[6]The "term 'unitary' is not a precise concept . . . [but instead] describe[s] a school system which has been brought into compliance with the command of the Constitution." *Freeman*, 503 U.S. at 487 (quotation marks omitted). Pursuant to *Green*, 391 U.S. 430, to achieve unitary status a school district must eliminate, to the extent practicable, the vestiges of de jure segregation in six areas: (1) student assignment, (2) faculty assignment, (3) staff assignment, (4) transportation, (5) extracurricular activities, and (6) facilities. A declaration of unitary status by a district court is appropriate after a school district demonstrates, by way of the *Green* factors, that "[first,] the [School] Board ha[s] complied in good faith with the desegregation [order] since it was entered, and [second,] . . . the vestiges of past [de jure] discrimination ha[ve] been eliminated to the extent practicable." *Dowell*, 498 U.S. at 249-50 (footnote omitted).

D.

Here, it is undisputed that in *Teel* and *Edwards* the School Board was found to have operated a dual school system "totally segregated on the basis of race" prior to the 1965-66 school year. J.A. 17. Consequently, under the *Teel* and *Edwards* orders and our precedents, the School Board was "charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination [within the school district] would be eliminated root and branch." *Green*, 391 U.S. at 437-438. However, in the decades following the issuance of *Teel* and *Edwards*, the School Board has yet to discharge this obligation and demonstrate to the district court its attainment of unitary status. To the contrary, the 2009 Consent Order specifically confirms that the desegregation orders in *Teel* and *Edwards* remain effective and applicable. J.A. 87-89 (explaining that "the parties have not requested the court to lift the 1970 desegregation orders," and further opining that "[i]t is time for the School Board to follow course and fulfill its obligation to attain unitary status so that it may reclaim complete control over its schools"). Indeed, the 2009 Consent Order expressly orders the School Board "to work toward attaining unitary status." J.A. 89.

Given that there is no dispute that the school district has not attained unitary status, the evidentiary burden should have been on the School Board to prove that the 2011-12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board's affirmative duty to eliminate the vestiges of discrimination and move toward unitary status.[7] *Brinkman*, 443 U.S. at 537 (explaining that, in

[7]The School Board asserts that Appellants' motion was a request for a preliminary injunction, and, therefore, that the district court properly applied the preliminary injunction standard and placed the burden on Appellants to establish, among other things, a likelihood of success on the merits. The problem with this argument is that Appellants' motion was not

considering challenge to pre-unitary school district's desegregation plan, "the Court of Appeals was quite right in holding that the Board was thereafter under a continuing duty to eradicate the effects of that system . . . . [and that t]hus, judgment for the plaintiffs was authorized and required absent sufficient countervailing evidence by the defendant school officials" (internal citation omitted)). Therefore, we find that the district court erroneously placed the evidentiary burden on Appellants.[8]

"preliminary" in any sense of the word. The underlying merits of this case were resolved more than forty years ago in *Edwards* and *Teel* when the School Board was found liable for a constitutional violation in its operation of a racially segregated school system. The School Board's suggestion that this procedural posture was altered—apparently by the district court's request for "*a report* detailing the School Board's efforts and progress in achieving unitary status"—is unpersuasive. J.A. 89 (emphasis added). Indeed, irrespective of whether the injunctive relief sought is characterized as preliminary or permanent, our precedents clearly establish that pre-unitary school districts bear the evidentiary burden of proving, among other things, that "current [racial] disparities are [not] causally related to prior segregation." *Baliles*, 829 F.2d at 1311; *see also Freeman*, 503 U.S. at 494.

[8]Our colleague in dissent is of the view that the 2009 Consent Order "settle[d] all disputes [between the parties] going back to the 1960s and 1970s" and, accordingly, the district court properly placed the evidentiary burden on Appellants to demonstrate a breach of the settlement agreement or the 2009 Consent Order. *Post* at 16-17.

On its face, however, the 2009 Consent Order does not settle the core dispute that arose in the 1960s and 1970s, namely, the School Board's unconstitutional operation of a dual school system and its continuing affirmative obligation to eliminate the vestiges of discrimination and move toward unitary status. *See* J.A. 87 ("[T]he parties have not requested the court to lift the 1970 desegregation orders."); *id.* (noting that the School Board "operated [prior to the 1970s] a dual, segregated school system with separate schools for blacks and whites"); *id.* at 89 ("It is time for the School Board to follow course and fulfill its obligation to attain unitary status."); *id.* ("The court ORDERS the parties to work toward attaining unitary status.").

Under our precedents, the pre-unitary status of the school system—a status initially determined by *Teel* and *Edwards* and recognized by the 2009 Consent Order—is determinative of the placement of the evidentiary burden on the School Board, irrespective of procedural posture.

## E.

"[W]e review judgments, not opinions" and, consequently, we are "entitled to affirm the district court on any ground that would support the judgment in favor of the party prevailing below." *Crosby v. City of Gastonia*, 635 F.3d 634, 643 n. 10 (4th Cir. 2011) (quotation marks omitted); *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984) ("[W]e must determine whether the [district court's] legal error resulted in an erroneous judgment."). Accordingly, the School Board argues that even if it "must bear the burden of proof in defending its 2011-2012 Assignment Plan . . . the evidence presented by the [School] Board was clearly sufficient to establish that the plan does not move [the school district] further from a unitary system." Appellee Br. at 27. In this regard, the School Board asserts that the 2011-2012 Assignment Plan "was developed in accordance with [Revised] Policy 10.107, . . . which [ ] was approved by the court's 2009 [Consent] Order." Appellee Br. at 28-29.

In two distinct respects, the School Board's arguments highlight the prudence of remanding this matter to the district court for reconsideration and, if appropriate, further development of the record. First, the School Board's articulation of its evidentiary burden is inaccurate. Whereas the School Board's argument is premised on its claim that the 2011-2012 Assignment Plan does not move the school district further from a unitary system, the School Board's actual burden is to establish that the 2011-2012 Assignment Plan moves the school district *toward* unitary status. *See, e.g.*, *Green*, 391 U.S. at 437-438. Second, the School Board's assertion that the 2011-2012 Assignment Plan is consistent with Revised Policy 10.107 is vigorously contested by Appellants. Among other things, Appellants argue that the School Board "neglected even to follow [Revised] [P]olicy [10.107] as approved by the court" as evidenced by the 2011-2012 Assignment Plan's failure "to consider either race or socio-economic status," as well as in the plan's consideration of only "a small subset of

schools in the [school] district." Reply Br. at 10-11 n. 2. We think it is proper that the parties' competing factual claims be considered in the first instance by the district court, applying the correct evidentiary burdens.

### III.

For the foregoing reasons, we vacate the district court's order and remand for reconsideration consistent with this opinion.

*VACATED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

In imposing on the Pitt County Board of Education the burden of proof with respect to the plaintiffs' motion for an injunction, the majority overlooks, I respectfully submit, the procedural posture of this case and, most importantly, the impact of the settlement agreement reached by the parties "as to all matters in dispute" from the date of the original desegregation orders to the date of the court's approval of the settlement agreement in a consent order, dated November 4, 2009. While the settlement agreement and consent order envisioned further work by the parties, as well as a culminating report from the parties on or before December 31, 2012, the agreement disposed of the foundational disputes, replacing them with the terms of the agreement.

More particularly, the settlement in this case purported to settle *all disputes* going back to the 1960s and 1970s and to replace those disputes with the terms of the agreement encompassed in the consent order issued by the district court. In that order, dated November 4, 2009, the district court found the settlement agreement to be "fair and reasonable," and it incorporated the terms of the agreement as the terms of the consent order. The order provides:

Accordingly, the court APPROVES the parties' settlement and GRANTS the School Board's motion for judicial approval of its 2006-2007 student assignment plan and revised Policy 10.107 (DE # 23). The court ORDERS the parties to work toward attaining unitary status so that the court may relinquish jurisdiction over this case and restore to the School Board full responsibility for the operation of its schools. The court further ORDERS the parties to submit, on or before December 31, 2012, a report detailing the School Board's efforts and progress in achieving unitary status and eliminating the vestiges of past discrimination to the extent practicable.

Thus any claim the plaintiffs could make after November 2009 against the Board of Education based on the earlier segregation conduct would have to be couched as a breach of the settlement agreement and consent order. And such a breach is precisely what the plaintiffs alleged in this case in their motion for an injunction.

In their motion for an injunction, the plaintiffs recounted the history of discrimination in the school district and the resolution of all disputes arising from the discrimination with the 2009 settlement agreement and consent order. The plaintiffs also alleged that after the court approved the settlement agreement, the parties worked well together "throughout 2010" in developing a new student reassignment plan for 2011-2012, to replace the 2006-2007 plan. They pointed out how the Board of Education conducted retreats, during which the plaintiffs were able to participate and provide input. But after the Board adopted its 2011-2012 student reassignment plan on November 15, 2010, the plaintiffs found the plan objectionable inasmuch as the Board "rejected a reassignment plan that would have resulted in much better outcomes for racial balance and academic achievement." They alleged that despite the fact they tried to work with the Board, the Board "has ignored these efforts." For that reason, the plaintiffs sought to enjoin

the Board's implementation of the 2011-2012 reassignment plan.

Addressing the plaintiffs' motion for an injunction, the district court disposed of the motion as it would have disposed of any motion for an injunction, imposing the burden of demonstrating the need for an injunction on the party bringing the motion. After reviewing all the evidence, the court made findings and concluded that the Board of Education did not breach the undertakings of the 2009 settlement agreement and consent order. It found that in accordance with the settlement agreement and consent order, the Board had held two retreats —one on July 1 and one on October 11, 2010—to which the plaintiffs were invited, and at those retreats, the "plaintiffs provided input and participated in the discussions concerning the development of a proposed reassignment plan." The court then found:

> While the school board ultimately rejected the [plaintiffs'] plan that plaintiffs maintain better accomplishes the School Board's stated objectives, the record reveals that the School Board utilized a methodical, reasonable and race-neutral process in developing the 2011-2012 reassignment plan. . . . Based on the record presently before the court, the court determines that plaintiffs have not demonstrated a likelihood of success on the merits of their claim so as to justify the extraordinary relief they request.

In this manner, the district court applied a burden of proof that is consistent with the disposition of any motion that would endeavor to demonstrate a breach of an agreement and consent order. The one who alleges the breach must carry the burden of demonstrating that it occurred. In this case, the court simply concluded that the breach which the plaintiffs alleged in their motion had not been demonstrated.

Of course, the ultimate question of whether unitary status will have been achieved by December 31, 2012, is a different question and will have to be satisfied by evidence produced by the Board. But the settlement agreement does not anticipate any review of this issue until the December 31, 2012 report is filed by the parties and the issue is presented to the court. At that time, the Board will have to show that its efforts satisfied the requirements of the settlement agreement and consent order in seeking to achieve unitary status.

Accordingly, I would conclude that the district court did not clearly err in its factual findings and did not abuse its broad discretion in denying the plaintiffs' motion for an injunction. I would therefore affirm the court's order, dated August 16, 2011, denying the motion.